# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY T. BLACK, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 17-cv-11987 |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                    **January 7, 2019**

## I.    Introduction

Plaintiff Mary T. Black ("Black") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration on March 11, 2013.  R. 10.[1]  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Black brought this action for judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration (the "Commissioner"), issued by the Appeals Council ("AC") on August 17, 2017 denying her claim.  R. 737-40.  Black moved to reverse the Commissioner's decision, D. 19, and the Commissioner moved to affirm, D. 22.  For the reasons stated below, the Court DENIES Black's motion to reverse and ALLOWS the Commissioner's motion to affirm.

---

[1] "R." refers to citations to the Administrative Record, filed at D. 13.

## II. Factual Background

Black was 52 years old on her date last insured, R. 655, and worked as a construction worker from approximately 1994 through 2005, R. 51-52, 80. After 2005 and until 2013, she engaged in intermittent, part-time work, including as an office cleaner. R. 52-58, 80.

## III. Procedural Background

Black filed a claim for SSDI benefits with the SSA on March 11, 2013, alleging disability as of April 1, 2006. R. 10. Her claim was denied upon initial review, R. 121-23, subsequently reviewed by a federal reviewing official and again denied on November 8, 2013, R. 125-27. On December 3, 2013, Black filed a timely request for a hearing before an ALJ. R. 10. The hearing was held on October 7, 2014, at which Black and vocational expert ("VE"), Crystal Hodgkins, testified. R. 28-91. At the hearing, Black amended her alleged onset date to September 30, 2009. R. 10. The ALJ thus focused his inquiry on the period between Black's onset date of September 30, 2009, and her date last insured, September 30, 2010. R. 42. In a written decision dated November 25, 2014, the ALJ found that Black did not have a disability as defined in the Social Security Act because Black was capable of performing her past relevant work as an office cleaner. R. 19.

On April 19, 2016, the AC denied Black's request for review. R. 1-3. Black next sought judicial review in Black v. Berryhill, No. 1:16-cv-11158-FDS, filed on June 20, 2016. The Court remanded Black's claim to the AC on March 13, 2017, directing the AC to examine whether Black's work as an office cleaner should be considered "past relevant work" under step four. R. 666-67.

On August 17, 2017, the AC issued its decision modifying the ALJ's decision. R. 650-56, 737-41. The AC affirmed the ALJ at steps one through three, as well as his residual functional

capacity ("RFC") finding, but did not affirm the ALJ's decision that Black was not disabled under step four. R. 653-54, 737-38. Instead, the AC held that Black was not disabled under step five because a significant number of jobs existed in the national economy that Black could perform. R. 654, 738. Accordingly, the AC determined that Black was not disabled. R. 656. The AC's decision is the final decision of the Commissioner. R. 650.

## IV. Discussion

### A. Legal Standards

#### 1. Entitlement to SSDI

A claimant must qualify as having a "disability" to be entitled to SSDI benefits. 42 U.S.C. § 416(i)(1). The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." Id. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). To qualify as a disabling impairment, the physical or mental impairment must be sufficiently severe such that it renders the claimant unable to engage in any of her previous work or other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner must follow a five-step sequential analysis to determine whether the claimant is disabled and thus whether the application for Social Security benefits should be granted. 20 C.F.R. § 416.920(a). The determination may be concluded at any step of the analysis. 20 C.F.R. § 416.920(a)(4). First, if the claimant is engaged in substantial gainful work activity, the application is denied. Id. § 416.920(a)(4)(i). Second, if the claimant does not have, or has not had, within the relevant time period, a severe medically determinable impairment or combination of impairments, the application is denied. Id. at § 416.920(a)(4)(ii). Third, if the impairment meets

3

the conditions of one of the listed impairments in the Social Security regulations, the application is granted.  Id. at § 416.920(a)(4)(iii).  Fourth, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's RFC.  Id. at § 416.920(a)(4)(iv).  If the claimant's RFC is such that she can still perform her past relevant work, the application is denied.  Id.  Fifth, if the claimant, given her RFC, education, work experience and age, is unable to do any other work within the national economy, she is disabled and the application is granted.  Id. at § 416.920(a)(4)(v).

### 2. *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner.  See 42 U.S.C. § 405(g).  Such judicial review, however, "is limited to determining whether [the Commissioner] deployed proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).  The Commissioner's findings of fact are conclusive and must be upheld by the reviewing court when supported by substantial evidence "even if the record arguably could justify a different conclusion."  Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted).  Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion," Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  This standard applies to reviewing ALJ and AC decisions, as both qualify as the final decision of the Commissioner.  See Menapace v. Colvin, 159 F. Supp. 3d 126, 129-30 (D. Mass. 2016).

**B. Before the AC**

*1. Medical History Presented to the AC*

When considering Black's application, the ALJ examined evidence about Black's medical history, including treatment records, assessments and diagnoses. R. 12-19. The AC relied on the materials before the ALJ.

    a.  <u>Affective Disorder and Anxiety Related Disorders</u>

Between January 2002 and September 2005, Black struggled to manage her anxiety. <u>See</u> R. 575-620. During this time, Black used various prescription drugs infrequently and inconsistently to treat her anxiety symptoms. <u>See</u> R. 575-620. Against the advice of her treating physician, Dr. Rajani Larocca, M.D. ("Dr. Larocca"), Black twice declined mental health referrals. R. 579-80. On June 10, 2005, Dr. Larocca prescribed Celexa and Lorazepam to Black. R. 498. Black also began therapy with Dr. Joseph Whitehorn, Ph.D. ("Dr. Whitehorn") during the summer of 2005. <u>See</u> R. 491-495. On September 2, 2005, Dr. Larocca reported that Black was feeling "more like herself" and doing better on Celexa and Lorazepam. R. 488. Dr. Whitehorn referred Black to psychiatrist Dr. Stephen Kleinman, M.D. ("Dr. Kleinman"). R. 486. Black first met with Dr. Kleinman on September 27, 2005 and continued to see him after that time. R. 486. According to treatment records from Dr. Kleinman and Dr. Larocca, Black remained stable on Celexa and Lorazepam from at least September 2005 until June 2014. <u>See</u> R. 370-559. She also attended therapy for most of that time. <u>See</u> R. 409, 415, 421, 434, 441, 458, 470. During the relevant period, Black's positive response to medication remained consistent. <u>See</u> R. 415-25. Black met with Dr. Kleinman multiple times during the relevant period and received positive reports each time. R. 415, 417, 422, 425. On October 29, 2009, Black informed Dr. Kleinman that the medications were a "big help," R. 425, and on April 26, 2010, Dr. Kleinman assessed that Black

had an "excellent response" to medication, R. 417. During an appointment on February 19, 2010, Dr. Larocca noted that Black was "doing better" on Celexa, Lorazepam and in counseling. R. 421.

### b. Osteoarthritis

Black reports osteoarthritis in her knees and legs. R. 61. On February 19, 2010, Black reported that she experienced right knee pain on stairs. R. 420. Dr. Larocca assessed that Black had no tenderness and a full range of motion in the right knee. R. 420. X-rays conducted on this date indicated that Black's bone marginalization was "normal" except for minimal tricompartmental marginal osteophytes. R. 323, 535. On July 29, 2013, she was diagnosed with "minimal osteoarthritis" in both knees. R. 554. X-rays taken on September 26, 2013, showed only "minimal" degenerative changes compared to the July 2013 x-rays. R. 569. Dr. Arthur L. Boland, M.D. ("Dr. Boland") assessed that there was no "significant arthritis" on this date and opined that the x-rays of same "look[ed] really quite benign." R. 565.

### c. Foot Disorder

Black's reported foot disorder consists of a bunion deformity and hammertoe. R. 13. Her treatment record from March 26, 2007 confirms "bilateral, left greater than right, bunions" and mild degenerative changes. R. 540. She considered surgery at this time, but did not schedule the procedure then. R. 302, 428. On September 8, 2009, Black followed up with podiatry regarding her bunion deformity. R. 428, 295. She scheduled surgery for September 29, 2009 to correct the bunion and lesser hammertoes on her left foot. R. 428, 295. Black, however, cancelled the surgery because she had just begun a new job and could not miss work. R. 428, 295. Black thought she would only miss two days of work when the recovery time would have been at least two months. R. 428, 295. Black underwent left foot bunion and hammertoe surgery on August 20, 2012. R. 276. On September 17, 2012, Dr. Larocca noted that Black was "recovering well." R. 276. As

of September 16, 2013, Black was considering revision surgery on her left foot because her "second toe [was] twisted and [was] overlapping the [third] toe." R. 550, 567. According to Black, however, this condition was not painful. R. 550.

### d. Migraines/Embolization for Aneurysm

Black has experienced migraines since childhood. R. 372. On June 25, 2012, she underwent a balloon assisted coil embolization for an aneurysm discovered during the workup for a complex migraine. R. 372. Three weeks following the operation, Black reported "feeling better than prior to her procedure, and denied headaches." R. 372.

### e. Medical Source Statements and Reports

#### i. *Treating Physician: Dr. Rajani Larocca, M.D.*

Dr. Larocca submitted a "Physical Residual Functional Capacity Questionnaire" assessing Black's impairments from her original onset date of April 1, 2006 to September 4, 2014. R. 641-645. Dr. Larocca diagnosed her with "[status post] cerebral aneurysm repair, depression, anxiety" and listed her prognosis as "good." R. 641. Dr. Larocca found that Black experienced occasional imbalance and migraine headaches. R. 641. She left blank the question asking whether Black experienced pain and identified the clinical findings and objective signs of Black's pain as "normal." R. 641. Although Dr. Larocca diagnosed Black with both depression and anxiety, R. 641, when asked to "identify any psychological conditions affecting [Black's] physical condition," Dr. Larocca checked off the box for anxiety, but not depression. R. 642. Based on this assessment, Dr. Larocca concluded that Black was capable of low-stress jobs. R. 642. She opined that Black's symptoms would "rarely" interfere with her concentration or attention span at work, R. 642, but posited that due to her impairments, Black would need one unscheduled thirty-minute break per month, R. 643, and one unscheduled day off from work per month, R. 644. Dr.

Larocca assessed that Black could sit for more than two hours at a time and that she could stand for one hour at a time. R. 642. In an eight-hour work day with normal breaks, Dr. Larocca determined that Black could sit for at least six hours and that she could stand or walk for about four hours. R. 643. She noted that Black was capable of climbing ladders rarely and stooping, crouching or climbing stairs occasionally. R. 644.

ii. *Initial Review: Dr. Barbara Trockman, M.D. and Dr. Joan Kellerman, Ph.D.*

State agency physicians, Dr. Barbara Trockman, M.D. ("Dr. Trockman") and Dr. Joan Kellerman, Ph.D. ("Dr. Kellerman"), evaluated Black's file at the initial level. R. 92-100. Dr. Trockman and Dr. Kellerman found that Black had no severe impairments. R. 96. Considering Black's mental impairments specifically, Dr. Kellerman noted that Black had a "good response to medication with relief from symptoms." R. 97.

iii. *Reconsideration Level: Dr. Theresa Kriston, M.D. and Dr. Lois Condie, Ph.D.*

Dr. Theresa Kriston, M.D. ("Dr. Kriston") and Dr. Lois Condie, Ph.D. ("Dr. Condie") evaluated Black's file at the reconsideration level, after her claim was denied on initial review. R. 101-11. Dr. Kriston found Black's foot disorder and her minimal osteoarthritis to constitute severe impairments. R. 105. She assessed that Black was "limited in the lower extremities" and that Black was thus limited in her ability to push and pull. R. 107. Dr. Kriston further assessed that Black could sit, stand or walk for six hours in an eight hour work day. R. 107. According to Dr. Kriston, Black was capable of climbing ramps, stairs, ladders, ropes and scaffolds occasionally; balancing, stooping, kneeling and crawling frequently and crouching occasionally. R. 108. Even with these limitations, Dr. Kriston determined that Black could perform light work. R. 109. Dr. Condie assessed Black's anxiety as non-severe, though he recognized that Black had

mild issues with concentration, persistence or pace. R. 106. Dr. Condie further assessed that Black had a "good response to medication," determining the functional impact of Black's anxiety to be "minimal." R. 106. Dr. Condie did not consider limitations arising from Black's depression because she added her diagnosis of depression after her date last insured. R. 106. He noted, however, that Black's medical record indicated that the impact of same on her functioning was "minimal." R. 106.

## 2. ALJ Hearing

At the October 7, 2014 hearing, the ALJ heard testimony from Black and the VE, Crystal Hodgkins. R. 10.

### a. Black's Testimony

Black testified that she worked full-time in construction from 1999 through 2005, at which time she was laid off. R. 59, 74. After leaving the construction field, Black worked a variety of temporary jobs, some during the relevant period. R. 52-59. For three weeks in 2009, Black worked a temporary job scanning documents. R. 55. In 2010, Black performed office cleaning work for two weeks and worked for UPS as a driver's helper around the holiday season. R. 57. Black attended a massage therapy training course in February 2010, but did not complete it due to her physical impairments. R. 66-67. Black testified that she struggled with depression, anxiety and PTSD during the relevant period. R. 60-61. She stated that she took Celexa and Lorazepam to treat her mental symptoms. R. 68. She reported seeing a therapist once during this time, but stopped therapy because she thought she could "handle it [herself]." R. 69. Black further indicated that her osteoarthritis was "just starting" during the relevant period, but that she experienced "terrible pain and the legs and knees." R. 61, 74. She also reported migraines once or twice a month and sometimes once every month or two months. R. 62.

Black testified to caring for her then three-year-old granddaughter for four hours a day, five days a week during the relevant period. R. 76. She indicated it was "easy to take care of her since she was young." R. 62. Black provided meals for her granddaughter, helped her get dressed and took her to school and the playground. R. 63. Although she called herself a "home person," Black sometimes hosted friends at her house and sometimes visited friends' houses. R. 69-70. With respect to her physical capabilities, Black testified that she could reach to get things out of the cabinets and climb stairs, but she had trouble lifting things. R. 64-65. Black indicated progress with her mental health, but continuing problems with the foot disorder, osteoarthritis and migraines. See R. 35-37, 65, 74. When asked to describe her depression and anxiety symptoms, Black responded that she took medication for same. R. 65. She indicated that she was seeing a new psychiatrist and that she was not in counseling at that time. R. 33. Black testified that her August 20, 2012 bunion and hammertoe surgery was not successful because one of her toes is now "severely crooked" and "very painful." R. 35-36. She stated that the surgery had affected her balance. R. 37. Black further alleged that she still had "terrible pain in her legs and knees." R. 74. After undergoing the embolization procedure for her aneurysm, Black indicated that she still experienced "slight migraines" which also contributed to a loss of balance. R. 37. When asked why she could no longer perform her temporary work from 2009, Black alleged back pain, leg pain and weakness. R. 74-75.

b. VE's Testimony

According to the VE, Black's past relevant work consisted of construction work and office cleaning. R. 80. The ALJ suggested that "in the aggregate" Black's temporary work as an office cleaner rose to the level of past relevant work and the VE adopted that suggestion. R. 79-80.

The ALJ posed three hypotheticals to the VE directed at the relevant period. R. 82-86. First, the ALJ asked the VE to consider:

> a person the claimant's age, education, work experience, able to perform duties at the light exertional level, but with the following limitations: can occasionally stoop, crouch, crawl, and kneel; frequently climb ramps or stairs, but only rarely, rarely climb ladders, ropes or scaffolds . . . . Could only occasionally operate foot controls. Occasionally being less than one-third of the time, or up to one-third of the time. Should avoid exposure to extreme cold and to workplace hazards such as dangerous machinery and unprotected heights; and would work in a low stress job having only occasional decision-making and occasional changes in work setting.

R. 82-83. The VE responded that this individual could not perform Black's past relevant work in construction, but that such a person could perform her past relevant office cleaning work. R. 83. The VE further testified that this hypothetical person could work as a storage facility clerk, in small parts assembly or as an inspector and hand packer, all of which were available in the national and regional economy. R. 83-84.

Second, the ALJ posed to the VE the same hypothetical but added that the hypothetical person could do occasional balancing such as walking on a narrow area or board and could not perform production rate or pace work. R. 84. The VE responded that such a person could perform Black's past relevant work as an office cleaner. R. 84. The VE further assessed that this hypothetical person could work as a storage facility clerk, a laundry worker or a rental clerk for furniture, all of which were available in the national and regional economy. R. 85.

Finally, in the third hypothetical, the ALJ asked the VE to consider a hypothetical person capable of performing at a light exertional level and to combine all of the limitations from the first two hypotheticals. R. 85. The ALJ further proposed that:

> due to limitations in concentration, pace, and persistence, whether due to physical pain or mental distraction, or both, this person would need to take two or more unscheduled breaks over the course of the workday, each break lasting at least 20 minutes. And these would be in addition to regular breaks. Also, this person would be off task 20 percent of the workday due to these limitations.

R. 85-86.  The VE responded that there would not be jobs in the national or regional economy for such a person.  R. 86.

Black's attorney also posed a hypothetical to the VE.  R. 87-88.  This hypothetical proposed a person who could sit for two hours at a time, up to six hours per day; stand for one hour at a time, up to four hours per day; occasionally lift ten pounds, and frequently lift less than ten pounds; and occasionally stoop, crouch and climb stairs.  R. 87-88.  The VE assessed that such a person could not perform any of Black's past relevant work.  R. 88.

### 3.  Findings of the ALJ

The ALJ followed the five-step analysis.  See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Black had not engaged in substantial gainful activity during the relevant period.  R. 12.  At step two, the ALJ concluded that Black's following impairments were severe: "affective disorder, anxiety related disorders, osteoarthritis, foot disorder (bunions, hammertoe) and status post embolization for aneurysm."  R. 13.  At step three, the ALJ determined that Black did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  The ALJ concluded that Black's medical impairments, "considered singly and in combination," did not meet the criteria of Listing 12.04 and Listing 12.06.  R. 13.  Regarding the "paragraph B" criteria for evaluating mental disorders, the ALJ found that Black's mental impairments caused only "moderate" limitations in one of the functional areas and no limitations in the remaining functional areas.  R. 13-14.  The ALJ further concluded that the "paragraph C" criteria for evaluating Listing 12.04 and Listing 12.06 mental disorders was not met.  R. 14.

At step four, the ALJ assessed Black's RFC.  R. 15.  The ALJ found that Black had the RFC to:

perform light work…except that [she] could occasionally stoop, crouch, crawl, kneel, or balance, frequently climb ramps or stairs, and rarely climb ladders, ropes or scaffolds. In addition, [she] could only occasionally operate foot controls. Furthermore, [she] should avoid exposure to extreme cold and to workplace hazards such as dangerous machinery and unprotected heights. [She] should work in a low-stress job with only occasional decision-making and occasional changes in work setting, and she is unable to perform production rate or pace work.

R. 15. Based on this RFC assessment and the VE's testimony, the ALJ concluded that Black was capable of performing her past relevant work as an office cleaner. R. 19. The ALJ did not reach step five after determining that Black was not disabled under step four. R. 19.

### 4. Findings of the AC

Black sought judicial review of the Commissioner's decision after the AC declined her request for review. R. 1-3. The Court remanded Black's claim to the AC to determine whether Black's "office cleaning experience satisfied the requirements of 'past relevant work' within the meaning of the Social Security Act." R. 659-60. The Court instructed the AC to "pay particular attention" to the fact that Black's work as an office cleaner would have to be considered "substantial gainful activity" to constitute past relevant work. R. 659-60. With these considerations in mind, the AC next reviewed the ALJ's five-step analysis pursuant to 20 C.F.R. § 404.1520.

The AC affirmed the ALJ's findings at steps one, two and three. R. 653. The AC further agreed with the ALJ's RFC assessment but did not agree with the ALJ's analysis at step four. R. 654. The AC instead found that Black "ha[d] established that that she ha[d] no past relevant work or [could not] perform her past relevant work because of her impairments." R. 654. Thus, the AC proceeded to a step five analysis. R. 654. The AC found that Black was not disabled at step five because significant jobs existed in the national economy that Black could perform. R. 654. The AC agreed with the ALJ and the VE that Black was capable of working as a storage

facility clerk, laundry worker or a rental clerk for furniture, all of which were jobs widely available in the national economy.  R. 654.

### C.  Black's Challenges to the AC's Findings

Black contends that the AC erred in affirming the ALJ's RFC finding which, according to Black, was erroneous.  D. 19 at 3.  Black alleges that the ALJ:  1) should have given controlling weight to her treating physician; 2) improperly adopted his own lay interpretation of the medical evidence; and 3) failed to assess how Black would react to work stress.  Id. at 3-11.  Because of these errors, Black contends that the AC erroneously held that she was not disabled at step five. Id. at 11.

1.  *The AC Did Not Err in Affirming the ALJ's Decision to Grant Black's Treating Physician's Opinion Little Weight*

Black alleges that the ALJ erred in granting little weight to the medical opinion of Dr. Larocca, Black's treating physician, and that he improperly afforded substantial weight to the opinion of Dr. Kriston, a non-treating physician.  D. 19 at 8.  Black contends that the ALJ erroneously rejected Dr. Larocca's proposed limitations that Black needed one thirty-minute unscheduled break per month and that she would be absent one day per month due to her impairments.  D. 19 at 4.  Black further asserts that the ALJ erred in not adopting Dr. Larocca's opinion that Black could only stand for one hour at a time and four hours total in a work day.  D. 19 at 8.  According to Black, Dr. Larocca's physical RFC finding limited her to only sedentary work and the ALJ should have given controlling weight to that finding.  D. 24 at 7.

Pursuant to 20 C.F.R. § 404.1527(d)(2), the ALJ must give controlling weight to a claimant's treating physician when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

record."[2]  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998).  Due to the relationship between the treating physician and the claimant, treating physicians are likely the "medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments."  20 C.F.R. § 404.1527(d)(1); Rohrberg, 26 F. Supp. 2d at 311.  Nevertheless, the ALJ may give the treating physician's opinion lesser weight when that opinion is not supported by substantial evidence.  Rohrberg, 26 F. Supp. 2d at 311 (citing Rivera v. Sec'y of Health & Human Servs., 986 F.2d 1407, No. 92–1896, 1993 WL 40850, at *3 (1st Cir. Feb. 19, 1993) (table decision)).  The treating physician's opinion may not be supported by substantial evidence when it is "inconsistent with other evidence in the record."  Reyes, 2017 WL 3186637, at *7 (quoting Shields v. Astrue, No. 10-cv-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011)) (internal quotation marks omitted).  The ALJ must consider six factors in deciding the proper weight to give a treating source opinion not entitled to controlling weight:

> 1) length of the treatment relationship and frequency of the examination; 2) nature and extent of the treatment relationship; 3) support of the opinion by medical signs and laboratory findings; 4) consistency of the opinion with the record as a whole; 5) specialization of the treating source; 6) other factors that may support or contradict the medical opinion.

Id. at *8; see 20 C.F.R. § 404.1527(c).  The ALJ need not expressly consider each factor, but must give "good reasons" for the weight afforded to a treating source's medical opinion.  Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (citing 20 C.F.R. § 404.1527(c)(2)); see Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011) (noting that the ALJ need not "methodically apply" each factor so long as his decision "makes it clear that these factors were properly considered").  Further, the ALJ must ensure his determination is

---

[2] This standard applies to claims filed before March 27, 2017.  See 20 C.F.R. § 1520(c); Purdy v. Berryhill, 887 F. 3d 7, 13 (1st Cir. 2018).  The Commissioner has since issued new regulations.  Black filed her claim on March 11, 2013, R. 10; thus, this standard applies to her claim.

"sufficiently specific to make clear" the weight given to a treating source's medical opinion and the reasons for that weight. Reyes, 2017 WL 3186637, at *8 (quoting Alberts v. Astrue, No. 11-11139-DJC, 2013 WL 1331110, at *8 (D. Mass. Mar. 29, 2018)).

Here, the ALJ afforded Dr. Larocca's medical opinion little weight because it was inconsistent with the medical record as a whole, inconsistent with Black's testimony at the ALJ hearing and lacked sufficient foundation. R. 18. The ALJ specifically noted that "with the exception of x-rays showing minimal osteoarthritis, and demonstrating the claimant's foot disorder, and minimal mental health treatment records demonstrating effective treatment with medication management, there is little to support Dr. Larocca's opined [RFC] assessment." R. 18. The Court agrees.

First, Dr. Larocca's own treatment notes and portions of her RFC assessment do not support the degree of limitation she proposed. See R. 420, 641-45. If a treating physician's "medical records of treating [claimant] were at odds with [her] conclusions purporting to support [claimant's] application" the ALJ need not give her opinion controlling weight. Purdy v. Berryhill, 887 F.3d 7, 13-14 (1st Cir. 2018). Dr. Larocca's notes on Black's treatment records during the relevant period indicate that Black's anxiety was well controlled by medication and counseling, that she was walking and doing calisthenics for exercise and that she experienced only occasional right knee pain, but had a full range of motion and no tenderness. R. 420. In her RFC assessment, Dr. Larocca left blank the question about Black's pain and described her as "normal" under the clinical finding and objective signs section. R. 641. Dr. Larocca's notes and RFC assessment thus undermine the severity of the limitations she indicated. See R. 420, 641-45. Other treatment records further undermine Dr. Larocca's opined limitations. See R. 302, 428, 540, 565, 569. X-rays of Black's knees taken during the relevant period showed normal bone marginalization. R. 569. Although Black experienced mild degenerative changes in her knees by 2013, a specialist

found that Black had no "significant arthritis." R. 565. Black's treatment records reflect that Black met with a podiatrist due to a bunion deformity during the relevant period. In 2009, Black failed to schedule the surgery promptly because, according to Black, she was working in a new job at the time and did not want to miss a significant amount of work. R. 428. Overall, the treatment records indicate that Dr. Larocca's proposed limitations were inconsistent with the medical record as a whole. See R. 302, 428, 540, 565, 569.

Finally, the assessments of the state agency physicians do not support the extent of Dr. Larocca's opined limitations. Dr. Kellerman found that Black's foot disorder was not a severe impairment and imposed no limitations. R. 96. Dr. Kriston noted Black's foot disorder, but imposed lesser restrictions more consistent with the medical record. R. 106-07. Dr. Kriston's finding that Black was "limited in lower extremities" and thus capable of less than the full range of light work reasonably accounted for Black's impairments in light of the medical record. R. 107. The ALJ's determination that Dr. Larocca's opined limitations were inconsistent with the medical record is supported by substantial evidence from Dr. Larocca's treatment record and portions of her RFC assessment, treatment notes from Black's other doctors and the medical source opinions of the state agency physicians. Compare R. 302, 428, 540, 565, 569 with R. 420, 641-45.

Dr. Larocca's opined limitations were also inconsistent with Black's own admissions of capability at the ALJ hearing; specifically, her ability to work temporary jobs and care for her granddaughter during the relevant period. R. 18. The ALJ must "comprehensively consider a claimant's daily activities" in determining a claimant's RFC and include "a discussion of why reported daily activity restrictions are or are not reasonably consistent with the medical evidence." Rohrberg, 26 F. Supp. 2d at 303. Additionally, the ALJ should specifically refer to supporting evidence in the record because "[e]xamining the claimant's daily activities helps to shed light on

the veracity of the claimant's claims of pain and illuminate an RFC determination." Id. at 309. Although Black stated she would not have been able to continue her temporary work full-time because of her osteoarthritis pain, Black's testimony indicates that her temporary work ended because the positions were only temporary and not because Black was incapable of doing the work. R. 52-58. Black did not indicate that she needed unscheduled breaks or absences in any of these positions and her work history does not reflect this need. Cf. Thomas A., 2018 WL 4087995, at *4 (finding plaintiff's unscheduled breaks and absences in prior work to be a notable factor in determining that plaintiff required this limitation due to his impairments). Furthermore, when asked whether she could sit, stand and walk while taking care of her granddaughter, Black answered "Yes. It was easy to take care of her since she was young." R. 62. During the relevant period, Black's daughter worked full-time and Black's granddaughter was in school for four hours per day. R. 76-77. By Black's own admission, she prepared meals for her granddaughter, took her to the playground, walked her to school and pushed her in the carriage. R. 62-63. Black's testimony was thus inconsistent with the extent of Dr. Larocca's proposed limitations. Compare R. 51, 62-62, 76-77 with R. 641-645.

The ALJ also granted little weight to Dr. Larocca's opinion because her RFC assessment lacked rationale or analysis. R. 18. An ALJ may grant little weight to a treating physician's opinion when the doctor provides "no discussion or analysis of his own prior observations." Purdy, 887 F.3d at 13; Reyes, 2017 WL 3186637, at *9 (noting that a medical source's preprinted checklist opinion was conclusory and supported the ALJ's decision to grant it little weight). In Purdy, the treating physician "simply check[ed] marked boxes indicating [claimant] had limitations . . . but did not explain why those limitations were chosen; in particular, he gave no examples of objective laboratory findings, symptoms or other medical evidence to support the conclusions." Purdy, 887

F.3d at 12.  The court held that the treating physician's act of "merely checking the right boxes" went a "long way towards supporting the ALJ's determination to accord [the treating physician's] opinion little weight." Id. at 13.  The court thus held that the ALJ did not err in giving the treating physician's opinion little weight. Id. at 14.

Similarly, here, Dr. Larocca's opinion provided no bases for her proposed limitations.  As discussed above, portions of Dr. Larocca's RFC analysis contradict the extent of her proposed limitations.  See R. 641-645.  Namely, Dr. Larocca did not answer when asked about Black's experiences of pain and described Black as "normal."  R. 641.  The inconsistences in the medical record and Black's testimony as well as the lack of analysis in Dr. Larocca's RFC assessment constitute "good reasons" to accord her opinion little weight.  See 20 C.F.R. § 404.1527(c)(2); Bourinot, 95 F. Supp. 3d at 177.  Contrary to Black's assertion that the ALJ failed to apply the factors in 20 C.F.R. § 1527(c), the Court concludes that the ALJ sufficiently considered these factors.  The ALJ's conclusions, at a minimum, reflect consideration of support of the opinion by medical signs and laboratory findings and the consistency of the opinion with the record as a whole.  Reyes, 2017 WL 3186637, at *8; Conte v. McMahon, 472 F. Supp. 2d 29, 48-49 (D. Mass. 2007) (finding that failure to address each factor and choosing to stress one factor over the others is not reversible error).  For these reasons, the ALJ did not err in giving Dr. Larocca's medical opinion little weight.

In accordance with his decision to afford Dr. Larocca's medical opinion little weight, the ALJ also did not err in rejecting Dr. Larocca's proposed limitations.  As explained above, the severity of Dr. Larocca's proposed limitations is not supported by the record as a whole.  Compare R. 302, 428, 540, 565, 569 with R. 420, 641-45.  In determining that Black could perform less than the full range of light work, the ALJ principally relied on the opinion of Dr. Kriston.  R. 18.  Black

contends that the ALJ erred in giving substantial weight to Dr. Kriston's opinion because her opinion, like Dr. Larocca's, contained little rationale or analysis. D. 19 at 10. The Court disagrees and concludes that ALJ did not err in giving substantial weight to Dr. Kriston's opinion limiting Black to less than the full range of light work. When an ALJ declines to give a treating physician's opinion controlling weight, he "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other [] physician, phycologist, or other medical specialist." 20 C.F.R. § 404.1527(d)(2)(ii); see Mercado-Mari v. Comm'r of Soc. Sec., No. 14-1292(BJM), 2015 WL 3629964, at *13 (D.P.R. June 10, 2015). Here, the ALJ gave substantial weight to Dr. Kriston's opinion because the limitations she proposed were "well supported by the minimal medical evidence of record for the relevant period." R. 19. Contrary to Black's assertion that Dr. Kriston's opinion was conclusory, the Court concludes that Dr. Kriston provided sufficient rationale or analysis for her opinion to justify the ALJ's grant of substantial weight. See R. 107-10. Unlike Dr. Larocca, Dr. Kriston included greater analysis indicating careful review of the medical record under the "Additional Explanation" portion of her RFC assessment. R. 108.

The opinion of a non-treating physician may satisfy the substantial evidence standard where the treating physician's report was conclusory. Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13 (1st Cir. 1982). Additionally, in Berrios Lopez v. Sec'y of Health & Human Servs., the court held that a non-treating doctor's medical opinion qualified as substantial evidence because it "contain[ed] more in the way of subsidiary medical findings to support his conclusions concerning [RFC] than customarily found in this type of report." Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991). The court noted that the doctor's report "at least briefly mention[ed] all of the complainant's alleged impairments and state[d] medical

conclusions as to each." Id. at 431. Consequently, the court determined that he had reviewed claimant's record with "some care" and that he had most of the medical evidence at his disposal. Id. The court thus held that the ALJ's decision to rely on the report of this doctor as opposed to the claimant's treating physician was supported by substantial evidence. Id. Similarly here, Dr. Kriston's medical opinion provided more rationale and analysis than Dr. Larocca's conclusory medical opinion. Compare R. 107-10 with R. 641-45. Her evaluation discussed Black's alleged physical impairments and "state[d] medical conclusions as to each." See Berrios Lopez, 951 F.2d at 431; see also R. 108. As such, the ALJ's decision to give substantial weight to Dr. Kriston's medical opinion was supported by substantial evidence. See Berrios Lopez, 951 F.2d at 431.

   *2. The AC Did Not Err in Affirming the ALJ's RFC Finding Because the ALJ Did Not Improperly Adopt His Own Lay Interpretation of the Medical Evidence*

The AC affirmed the ALJ's determination that despite Black's mental impairments, she could perform light work "in a low-stress job with only occasional decision-making and occasional changes in work setting" and that she was "unable to perform production rate or pace work." R. 655. Black contends that the ALJ exceeded his authority in forming her mental RFC. D. 19 at 3. According to Black, the ALJ improperly relied on Dr. Kriston's RFC finding because she did not consider Black's anxiety to be a severe impairment and thus did not analyze Black's mental RFC. Id. at 3-4. Black claims that the only physician to analyze her mental RFC was Dr. Larocca, whose opinion the ALJ afforded little weight. Id. at 4. As such, in finding Black's mental impairments to be severe, Black alleges that the ALJ was required to accept Dr. Larocca's proposed limitations or obtain another medical opinion. Id. at 5. Black asserts that the ALJ's failure to do so constituted an impermissible "lay assessment of the medical evidence." Id. The Court disagrees.

The determination of a claimant's RFC is an administrative finding reserved to the Commissioner. Purdy, 887 F.3d at 14. Although the ALJ has the authority to make an RFC finding, the ALJ as a "lay person" may not "interpret raw medical data in functional terms." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). When a claimant puts her "functional inability to perform her prior work in issue," the ALJ must assess the claimant's capabilities by consulting an expert's RFC finding unless the extent of the claimant's impairments and their effects on performance "would be apparent even to a lay person." Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F. 3d 16, 17 (1st Cir. 1996) (quoting Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991)).

An ALJ determines an applicant's RFC "based on all relevant evidence in the record, including statements from medical sources, descriptions of limitations and observations of impairments." Reyes, 2017 WL 3186637, at *11 (citing 20 C.F.R. § 416.945(a)(3)). Relevant evidence includes:

> (1) medical history, signs and laboratory findings; (2) the effects of treatments; (3) reports of daily activities; (4) lay evidence; (5) recorded observations; (6) medical source statements; (7) effects of symptoms reasonably attributed to a medically determinable impairment; (8) evidence from attempts to work; and (9) need for a structured living environment.

Id. (citing Social Security Ruling (SSR) 96-8p: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34,474 (July 2, 1996)). The ALJ may use both medical and nonmedical evidence to assess an applicant's RFC because "pain or other symptoms may cause limitations beyond or less than that 'which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone.'" Id. (citing 20 C.F.R. § 416.945(e)). "It is only '[w]here the evidence is inconsistent or insufficient to enable the ALJ [to] make a decision' that the ALJ may recontact medical sources or seek additional evidence from another medical source." Id. at *10 (quoting Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at

*5 (1st Cir. June 9, 1994)).  Black contends that, as a lay person, the ALJ did not have the authority to impose the functional limitations that Black could work "in a low-stress job with only occasional decision-making and occasional changes in work setting" and that she was "unable to perform production rate or pace work."  D. 19 at 5; D. 24 at 3; see R. 655.

Where an ALJ "properly resolved conflicts in the record, supported his RFC determination with other substantial evidence in the record and explained his conclusions . . . he did not need a medical source's RFC assessment to corroborate his RFC finding."  Reyes, 2017 WL 3186637, at *13.  Here, the ALJ considered conflicting medical source opinions and gave "good reasons" for the weight accorded to each.  See R. 18-19; see also 20 C.F.R. § 404.1527(c)(2).  Moreover, the relevant evidence supports the ALJ's determination that Black could work in a low-stress job environment as defined above.  See R. 15, 73, 106, 409, 415, 417, 422, 425, 430.  At the ALJ hearing, Black testified that she did not have a supervisory role and did not execute independent judgment in her past relevant work in construction, R. 73, allowing the ALJ to conclude reasonably that Black was limited to occasional decision-making.  R. 15.  Furthermore, the ALJ found that Black had moderate difficulty with concentration based on her mental status examinations.  R. 14. Dr. Kleinman's treatment records support this conclusion, listing concentration as one of the symptoms of Black's mental impairments.  R. 409, 415, 417, 422, 425, 430.  Dr. Condie assessed that Black had mild difficulty with concentration, persistence or pace.  R. 106.  Based on these medical opinions, the ALJ could conclude reasonably that difficulties with concentration could limit Black to a routine work setting and less than production rate work.  See R. 15; Reyes, 2017 WL 3186637, at *11.  The ALJ's proffered limitations are thus consistent with the relevant evidence.  Additionally, the ALJ's proposed limitations are functional limitations consistent with a low-stress job environment.  See Jeffrey S. v. Social Sec. Admin. Comm'r, No. 2:17-cv-00468-

NT, 2018 WL 4046510, at *2 (D. Me. Aug. 24, 2018) (noting that occasional decision-making, occasional changes in work setting and limitations on production rate or pace constitute a low-stress job environment).

Black does not challenge these specific limitations, but instead challenges that these are the "only" limitations the ALJ imposed with respect to her mental RFC. D. 24 at 3. Nevertheless, the ALJ relied upon substantial medical and nonmedical evidence in determining that the extent of Black's limitations was not as severe as that posited by her and Dr. Larocca. See Reyes, 2017 WL 3186637, at *10 (upholding ALJ's assessment "of the medical and nonmedical evidence in the record to determine that [plaintiff] did not suffer from an impairment imposing significant exertional restrictions"). There is nothing in the record to suggest that Black was more severely limited than what the ALJ proposed. The ALJ concluded that Black's medically determinable impairments could be reasonably expected to cause her alleged symptoms, but that Black's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." R. 16. For example, Black amended her alleged onset date to September 2009 because, according to her attorney, Black's foot disorder "was really starting to bother her" at that time. R. 39. Black first saw a specialist for the foot disorder in September 2009. R. 41, 295, 498. Notably, Black attributed her inability to work her temporary jobs from 2009 not to her foot disorder, but rather to back pain, leg pain and weakness. R. 74-75. Thus, the ALJ was not required to recontact medical sources or to seek another opinion because his mental RFC finding is supported by the relevant evidence. Reyes, 2017 WL 3186637, at *10. The ALJ relied on Dr. Larocca's RFC assessment in concluding that Black was limited to low-stress work and imposed limitations consistent with the definition of low-stress work, Black's testimony and her treatment

records.  See R. 15, 642.  Accordingly, the ALJ did not overstep his bounds in determining Black's mental RFC.

### 3.  The AC Did Not Err in Affirming the ALJ's RFC Finding Because the ALJ Properly Considered Black's Reaction to Work Stress

Black next alleges that the ALJ's mental RFC finding failed to conduct a proper analysis of how Black would react to work stress.  D. 19 at 5-7.  According to Black, the ALJ erroneously omitted from his hypotheticals to the VE Dr. Larocca's specific limitations that Black required one thirty-minute unscheduled break per month and that she would need to take one day off per month due to her limitations.  D. 24 at 4.  Consequently, Black argues that the ALJ failed to comply with Social Security Ruling 85-15, requiring an individualized examination of the claimant's stress, and Lancellotta v. Sec'y of Health & Human Servs., requiring the ALJ to make findings "on the nature of [the claimant's] stress, the circumstances that trigger it, or how those factors assess his ability to work."  Lancellotta v. Sec'y of Health & Human Servs., 806 F.2d 284, 285 (1st Cir. 1986).  The ALJ's conclusion, however, that Black is limited to "low-stress job[s] with occasional decision-making and occasional changes in work setting" and that she is "unable to perform production rate or pace work" is consistent with the requirements of Social Security Ruling 85-15 and Lancellotta. See R. 15.  Lancellotta interpreted Social Security Ruling 85-15 to require an examination of an individual's "specific vocational abilities when mental impairments are at issue."  Lancellotta, 806 F.2d at 285-86.  Accordingly, the ALJ must "define[], in functional terms, what he meant by a low-stress job vis-à-vis plaintiff's limitations."  Tanco v. Comm'r of Soc. Sec., Civ. A. No. 17-10048-ADB, 2018 WL 1082399, at *8 (D. Mass. Jan. 30, 2018).  As previously discussed, the ALJ properly accorded little weight to Dr. Larocca's medical opinion with respect to the extent of Black's limitations.  R. 18.  Even so, the ALJ adopted Dr. Larocca's determination that Black was limited to low-stress jobs and proposed limitations consistent with that conclusion.  Cf. Rose v.

Shalala, 34 F.3d 13, 19 (1st Cir. 1994) (ruling that the ALJ erred in failing to mention any functional limitation arising from the symptoms of plaintiff's impairment).  In the second abovementioned hypothetical, the ALJ posed to the VE the mental limitations that he ultimately adopted.  R. 84; see Tanco, 2018 WL 1082399, at *8 (finding that the ALJ properly delineated [plaintiff's] limitations and how those limitations impacted his ability to work in hypothetical including limitations on decision-making and changes in work setting).

Based on the relevant evidence and the second hypothetical to the VE, the ALJ properly determined Black's ability to function in a low-stress work environment.  See R. 15, 84.  The ALJ specifically delineated Black's limitations in his hypothetical to the VE, constituting "individualized findings on the nature of plaintiff's stress" as required by Lancellotta.  Tanco, 2018 WL 1082399, at *8; see Degraffenreid v. Colvin, No. 15-cv-10185-ADB, 2016 WL 5109509, at *8 (D. Mass. Sept. 20, 2016) (emphasis omitted) (finding that the ALJ satisfied Lancellotta in explaining "that [plaintiff] was limited to 'low-stress work with only occasional decision-making and occasional changes in [the] work setting, but is unable to perform production rate or pace work'").  As such, the ALJ did not err in assessing Black's reaction to work stress.

### 4.  The AC Did Not Err In Finding Black Not Disabled At Step Five

Although this action comes before the Court upon review of the AC's decision, rather than the ALJ's, Black's arguments are predicated on her claim that the ALJ improperly determined her RFC.  See id. at 3-11.  Black argues that the AC's "critical error" was its adoption of the ALJ's allegedly erroneous RFC assessment, and that the AC improperly relied upon this assessment in finding Black not disabled at step five.  Id. at 3, 11.  The Court, however, rejected Black's arguments with respect to the ALJ's RFC finding in the discussion above.  The Court thus concludes that the ALJ properly assessed Black's RFC and, for the reasons discussed above, that

his determination was supported by substantial evidence. As such, the AC did not err in adopting the ALJ's RFC assessment.

The Commissioner bears the burden at step five to show that there are jobs available in the national and regional economy that the claimant could perform. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). Black alleges that the Commissioner failed to meet this burden because the ALJ's hypotheticals to the VE, who opined that Black was capable of working as a storage facility clerk, laundry clerk and rental clerk for furniture, were insufficient. D. 19 at 10-11; R. 85. Specifically, Black challenges that the ALJ did not pose Dr. Larocca's opined limitations to the VE and thus only posed hypotheticals involving light, rather than sedentary, work. D. 19 at 11. According to Black, the ALJ's hypotheticals left "no way to know" Black's true working capabilities. Id. The Court disagrees. "[I]t is well within the ALJ's authority to weigh the evidence, to determine credibility of the claimant's subjective complaints, and to use only credible evidence in posing a hypothetical question to a [VE]." Mercado-Mari, 2015 WL 3629964, at *13. Because the ALJ had "good reasons" to give Dr. Larocca's opinion little weight, the ALJ was not required to pose Dr. Larocca's specific limitations to the VE. The ALJ posed limitations consistent with his assessment of the medical source opinions, the medical record as a whole and Black's hearing testimony. See R. 82-86. His hypotheticals were based on Dr. Kriston's opinion that Black was capable of performing less than the full range of light work. See R. 82-86. He acted within his discretion in giving Dr. Kriston's opinion substantial weight and thus had the authority to pose hypotheticals consistent with her opinion. Mercado-Mari, 2015 WL 3629964, at *13.

Furthermore, the ALJ's hypotheticals were sufficiently specific. An ALJ's hypothetical "must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and

accurately transmit the clarified output to the expert in the form of assumptions." Arocho, 670 F.2d at 375. Moreover, the hypothetical "must accurately reflect the claimant's limitation in order for the VE's response to constitute substantial evidence sustaining the [Commissioner's] burden." Torres v. Sec'y of Health & Human Servs., 976 F.2d 724, 1992 WL 235535, at *5 (1st Cir. Sept. 23, 1992) (unpublished table decision). In his hypotheticals, the ALJ enumerated specific limitations – for example, the proposed limit on "rarely" climbing ladders – which "clarified the outputs and accurately transmitted said outputs to the VE." Reyes, 2017 WL 3186637, at *13. The ALJ thus posed adequate hypotheticals based on his RFC finding. The AC adopted the VE's testimony that Black could work as a storage facility clerk, laundry worker or rental clerk for furniture. R. 654. The VE's testimony arose from the ALJ's hypotheticals, predicated on the ALJ's RFC assessment. "[A] VE's testimony must be predicated on a supportable RFC assessment" to satisfy substantial evidence. Mercado-Mari, 2015 WL 362994, at *13.

As previously discussed, this Court finds that the ALJ did not err in forming his RFC assessment. The Court now concludes that the ALJ's hypotheticals to the VE were sufficient to accord the VE's testimony as substantial evidence supporting the AC's decision at step five. Because the ALJ's hypotheticals were sufficient, the VE's testimony satisfies the Commissioner's burden. Accordingly, the Court rules that the AC did not err in denying Black's claim at step five. R. 654, 738.

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm, D. 22, is ALLOWED and Black's motion to reverse, D. 19, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge